221 A.2d 790.

STATE *vs.* JAMES EDWARD McPARLIN.

JULY 28, 1966.

PRESENT: Roberts, C. J., Paolino, Powers and Joslin, JJ.

POWERS, J. This indictment for murder was tried to a superior court justice sitting with a jury and resulted in a guilty verdict of first degree murder. The case is before us on the defendant's bill of exceptions, nine of which he

has briefed and orally argued. His other exceptions are considered to have been waived. *Arch Lumber Co.* v. *Archibald,* 88 R. I. 49; *Dolman* v. *Saltzman,* 100 R. I. 327, 215 A.2d 232.

Moreover defendant has so grouped the exceptions relied on as to present two main contentions and it is as so posited that said exceptions will be considered.

It is uncontroverted that on the evening of January 7, 1960 defendant, accompanied by one Leo Hallal and the latter's wife Joan, drove to a wooded area in the rear of a sandbank located in Burrillville, Rhode Island, for the ostensible purpose, or so Leo Hallal believed, of meeting Joan's boy friend. In point of fact defendant was the so-called boy friend but he and Joan were engaged in a venture which, both testified, was designed to convince Leo that such was not the fact. While the three were supposedly searching in the woods for an individual whom defendant and Joan knew to be nonexistent, Leo Hallal was fatally shot in the back of his head.

According to Joan, defendant shot Hallal while the two men were away from the car in which she was waiting where it had been parked. The defendant, however, claimed that while he and the deceased were talking, Joan joined them and fired the fatal bullet.

In any event, it is also uncontroverted that defendant and Joan left the scene in the deceased's car and together prepared a story which was intended to give the impression that Leo had become angry with his wife and deserted her and her children.

It further appears that the location to which defendant had driven and where Leo had been shot was owned by an aunt of one Russell Banville who had told defendant of the area when the latter had inquired if Banville knew of some unfrequented place where defendant might "hide some hot stuff." It was to Banville that defendant turned

after dropping off Joan on the night Hallal was killed. The defendant told Banville that a man had been accidentally shot and he requested Banville's help in disposing of the body. Together they drove back and covered it with leaves.

The car was registered to the deceased and on the morning after the shooting, Banville, acting on defendant's instructions, drove to New York where he abandoned it in the vicinity of Grand Central station. Further, acting on defendant's instructions, Banville sent Joan a telegram from the station where he also left Hallal's empty wallet as requested. The telegram, purporting to have been sent by the deceased, stated that he was leaving Joan and this, coupled with a finding of the abandoned car and wallet, was intended to lend credence to Joan's story that her husband had become angry, physically abused and left her.

The record further establishes that defendant subsequently returned to the scene of the shooting, this time with his brother, and together buried the body. Between the night of January 7, 1960 and early summer of that year, defendant made a number of trips to the gravesite, smoothing over the ground, planting grass seed and taking such other steps as would tend to conceal the fact that there had been digging. On some of these occasions he was accompanied by his brother and on others by one Raymond Poisson. It is the latter's testimony that sometime in February 1960 defendant asked Poisson to accompany him to a place in Burrillville where defendant claimed to have purchased some land and to assist in leveling off a depression on which defendant said he intended to build. Poisson accompanied defendant on that occasion as well as on two others — one in April and one in June.

On August 10, 1960, defendant told Poisson that the police were inquiring about the missing Leo Hallal and

urged Poisson to deny ever having visited the area in Burrillville if questioned by the police. The defendant, Poisson testified, also advised him that he too would deny ever having accompanied Poisson to the place in question. It appears that this conversation troubled Poisson and later on the same day he discussed it with two men, one of whom was his uncle. As a result of their discussion, the three went to the site and after some digging discovered evidence indicating the presence of a body. That evening, Poisson reported his grim discovery to the state police. They investigated and, confirming Poisson's suspicions, launched a full-fledged investigation, which included an order for the apprehension of defendant and Joan Hallal.

State and Pawtucket police officers were sent to the homes of Joan and defendant sometime after one o'clock on the morning of August 11, 1960. Arriving at the home of Mrs. Hallal, then Sergeant O'Connell of the state police and two other officers were admitted and without a warrant proceeded to search the premises for defendant. He was found hiding in a clothes closet and with Joan was taken into custody. Both suspects were first taken to the Pawtucket police station for questioning and shortly after were taken to the scene in Burrillville where they arrived at or about two o'clock in the morning. In his testimony Sergeant O'Connell admitted that Joan's house had been searched without a warrant and that defendant was taken into custody and questioned without being advised of his rights to remain silent and to be represented by counsel. The sergeant also testified as to statements and admissions made to him by defendant.

It is in connection with this phase of O'Connell's testimony that defendant makes his first contention. On cross-examination O'Connell conceded that the search of Joan's home was made without a warrant and over her objection.

The defendant thereupon moved that all disclosures made by him at the time of his apprehension be struck on the ground that they were the result of an illegal search and to the denial of his motion defendant duly excepted. He then moved that the case be passed and excepted to the denial by the trial justice. Further, defendant moved that O'Connell's testimony as to defendant's disclosures be struck on the ground that they were the fruits of an illegal arrest. In his oral argument and brief, defendant consolidated these exceptions in support of a contention that the ruling of the trial justice was prejudicial in each instance. In support thereof he cites several cases, none of which is controlling on the issues of either the search or the arrest. No constitutionally protected right of his was violated by reason of an unlawful search of the premises of another. *Goldstein* v. *United States*, 316 U. S. 114.

Nor in view of the known circumstances upon which the police acted, can it be contended that defendant's arrest was made without probable cause. See G. L. 1956, §12-7-4. His repeated trips to the gravesite as related by Poisson and his request of the latter that they both deny ever having visited the site if questioned by the police, coupled with the discovery of a body and the known intimacy of defendant with the wife of the missing Leo Hallal, are but a skeletal reference to information upon which the police acted and they clearly establish probable cause. His exceptions numbered 9, 10 and 11 are without merit and overruled.

Before turning to defendant's second contention which is predicated on exceptions numbered 10, 11, 13, 41, 43, 44, 64 and 83, we deem it advisable to note that we are not here concerned with the rule laid down in *Escobedo* v. *Illinois*, 378 U. S. 478, and as expanded by *Miranda* v. *State of Arizona*, 384 U. S. 436. In *Johnson* v. *State of New*

*Jersey,* 384 U. S. 719, the United States supreme court refused to make the rule retroactive, confining the holdings in those cases to trials held after the *Escobedo* decision for the application of its rule and trials held after *Miranda* in cases relying thereon.

Nor are we concerned with the rule laid down by this court in *State* v. *Mendes,* 99 R. I. 606, 210 A.2d 50, having recently held in *State* v. *Gannites,* 101 R. I. 216, 221 A.2d 620, that the *Mendes* rule would be applied only prospectively as to persons taken into custody thirty days or more after our decision in *Mendes* had been filed. The arrest of the instant defendant preceded the landmark cases by several years.

An examination of each of the eight exceptions upon which defendant predicates his second contention discloses that none of them constitutes grounds for a new trial. The first two are those numbered 10 and 11, and have been previously considered and rejected. The third exception numbered 13 is likewise without merit. It was taken to a ruling by the trial justice sustaining the state's objection to a question asked in cross-examination of then Corporal Robert X. Mathews. The question sought to discover whether the corporal had informed defendant of his right to counsel and whether Mathews had offered to obtain an attorney. The defendant made no offer of proof and whether he expected to obtain a negative answer is not made to appear. Assuming that defendant had obtained the answer he hoped for, however, its exclusion was in nowise prejudicial, being immaterial under the rule then prevailing.

The next exceptions, being numbered 41, 43 and 44, were also taken to rulings of the trial justice sustaining the state's objection to questions asked in cross-examination of Joan Hallal. They sought to inquire whether defendant was in the habit of leaving medication with

Joan and we are totally unable to comprehend their import. Neither in oral argument nor in his brief has defendant related these exceptions to the thrust of his contention, namely, that all statements oral or written made by defendant were inadmissible for the reason that defendant had not been advised of his rights to remain silent and to be represented by counsel. Again, as is the case with all of the exceptions based on the exclusion of testimony, defendant made no offer of proof.

The seventh grouped exception, being numbered 64, is based on the refusal of the trial justice to permit defendant to answer the question whether or not he had taken a lie detector test. Again there was no offer of proof, but also in this instance defendant subsequently stated that he had and this answer became a part of the record.

The defendant's final exception, being numbered 83, is to the failure of the trial justice to instruct the jury "on the effect of the statements and what is necessary for the jury to consider the statements which were introduced into evidence."

We are at a complete loss as to the import of this exception. The record does not disclose that any request was made of the trial justice to instruct the jury in the manner for which his failure is, by this exception, now alleged to constitute prejudicial error. Nor was so much as a reference thereto included in either defendant's brief or oral argument. We can only speculate therefore as to what defendant has in mind.

The record discloses that during the period defendant was being interrogated and prior to his arraignment, he wrote out a statement purporting to be an account of how Leo Hallal came to his death. This statement was admitted into evidence as state's exhibit 57 with the expressed consent of defendant. Still later in his interrogation, defendant signed a typewritten question-and-answer state-

ment, the substance of which was not materially different from that contained in the holographic statement. This second statement, marked state's exhibit 58, was also received in evidence with the expressed consent of defendant. It should be noted that these statements differed sharply with defendant's testimony.

If we are to speculate, it must be presumed that these are the statements to which defendant refers in his final exception. Why they should have been the subject of a specific instruction to the jury, however, we are not advised. Under such circumstances the exception is meaningless.

Thus it is that no one of defendant's exceptions is predicated on such error as would entitle defendant to a new trial.

The defendant appears to contend that, taken together, the exceptions preserved predicate reversible error on the proposition that all of his statements, admissions and/or disclosures were improperly admitted, being involuntary in nature and as such constitute denial of due process. In support thereof he relies on *Escobedo* v. *Illinois*, *supra*, and *State* v. *Mendes*, *supra*. We have heretofore observed that they are inapplicable.

The defendant does, however, in his brief and oral argument refer to the hours of his interrogation, the denial of counsel although requested, the brutality of the police, and other factors the like of which are referred to in *Haynes* v. *Washington*, 373 U. S. 503, at 514 as "a totality of circumstances evidencing an involuntary written admission of guilt." Under our practice, however, this type of review is not available by way of a bill of exceptions.

It might be otherwise in post-conviction proceedings in the superior court where the necessary evidentiary hearing may be had. In the instant record, however, some of the factors upon which defendant would rely are in dispute.

While it is true that we have heretofore indicated that in a proper case we would not put a defendant to the delay and exigencies attendant upon a post-conviction remedy, see *State* v. *Kilday*, 99 R. I. 209, 206 A.2d 537, and *State* v. *Dufour*, 99 R. I. 120, 206 A.2d 82, we are not persuaded that under such circumstances as are here present the instant review should not be confined to normal procedure.

The defendant's exceptions briefed and argued are overruled, and the case is remitted to the superior court for further proceedings.

*J. Joseph Nugent*, Attorney General, *Corinne P. Grande*, Special Assistant Attorney General, for State.

*Leo P. McGowan, William F. Reilly*, for defendant.