[Crim. No. 11579.   Second Dist., Div. Two.   Nov. 21, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. JESSE BOSBY et al., Defendants and Appellants.

Patrick J. Sampson and William V. Shannon, Jr., under appointments by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J.—Each of the defendants Bosby, Cooper, Harrington and Rhone has appealed from the judgment entered upon the verdict of a jury finding him guilty of

murder in the first degree.[1] The jury fixed each appellant's sentence at life imprisonment.

Appellants contend (1) that their extrajudicial statements were obtained without compliance with the rules enunciated in *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; (2) that their extrajudicial statements were not edited to prevent "cross-incrimination" as required by the retroactively applicable standards established in *People* v. *Aranda,* 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]; and (3) that the court erred in instructing on premeditated murder when, absent the application of the felony-murder doctrine, the evidence was insufficient to sustain a verdict of first degree murder. We find no merit in these contentions.

The evidence is without material conflict. Defendants Bosby, Cooper and Harrington offered no defense, neither testifying themselves nor calling any witnesses to testify in their behalf. Defendant Rhone did take the stand but his version of the events in issue did not differ in any substantial way from that presented by the prosecution.

In summary, the evidence in support of the judgment establishes that appellants were seen to transfer from one car to another a short distance from the combination liquor and grocery store owned and operated by Mrs. Robbins and her brother, Darrell Ashcraft. The time was approximately 2 p.m. on Friday, December 11, 1964, when Mrs. Robbins would have a large amount of cash on hand to enable her to cash the pay checks of the employees of the several businesses located near her store.

Appellants Cooper and Bosby entered the store at or about the same time. Cooper asked Mrs. Robbins if she would cash a pay roll check. She indicated that she would but would have to examine it first. Cooper, after reaching into his pocket, stated that he must have left his check in his car and went outside to get it. In the interim, Bosby engaged Mr. Ashcraft in conversation regarding a particular size bottle of wine. When Cooper returned he was accompanied by Harrington and Rhone who took positions within the front of the store. Mrs. Robbins remembered seeing them a few moments earlier

---

[1] At the time of oral argument, this court was advised by counsel that appellant Cooper had died on May 21, 1967, during the pendency of this appeal. Thereafter, respondent's motion to abate appellant Cooper's appeal, supported by a certified copy of the certificate of his death, was granted.

outside her store recalling in particular Harrington's bright red hair.[2]

Although Mrs. Robbins testified that the check presented to her by Cooper and the accompanying identification appeared to be in order, she intuitively felt something was amiss. As she expressed it: "Yes, he [Cooper] handed it to me and I looked at it and I knew it was a good check. I had cashed this company's checks before, but, I don't know, there was something about the way Mr. Rhone looked or something, I knew I wasn't going to open that box." By "box" she referred to a "check cashing register" in which the large sums of money were kept in addition to the regular amounts within the "main cash register."

At this point Mrs. Robbins heard and observed what appeared to her to be a "collision" between Bosby, who was in the rear of the store, and an elderly employee, Ben Serna. She testified that both men fell and when they arose she saw Mr. Serna moving towards her in a jerking fashion as if being prodded by Bosby whom she heard say, "Man, I told you not to give me any trouble."

While Mrs. Robbins' attention was diverted in the direction of Bosby and Mr. Serna, her brother, who could not see them from his position nearer the front of the store, observed Cooper and Harrington each draw a gun. Harrington told him to "Hold it." Mrs. Robbins testified that she continued to watch Bosby and Mr. Serna as they approached her, and observed that Bosby had a gun pressed against Mr. Serna's body. Mrs. Robbins then reached for her own gun which was kept in a drawer beneath the cash register but as she drew it out Rhone moved forward and seized her wrist and either he or Cooper removed the gun from her hand.

Mr. Ashcraft also saw his sister disarmed, and when he was told to move to the rear of the store, he complied and tried to push his sister on ahead of him. At this point a shot was heard and while Mr. Ashcraft could not see who fired the shot, Mrs. Robbins testified that she saw Bosby shoot Mr. Serna at point-blank range. Serna took a few steps forward with blood running from his mouth and shirt front and then fell dead upon the floor. Both Mrs. Robbins and Mr. Ashcraft complied with the orders to move to the rear of the store but in the confusion of their exit the electric cord that supplied power to

---

[2] Apparently Rhone, Cooper and Bosby were readily identified as Negroes while Harrington was originally described as either white or a very light-skinned Negro.

the register was pulled from its socket which prevented it from being opened. They exited through the rear of the store and when they returned appellants had departed.

Other witnesses saw appellants run to the car in which they had arrived and drive rapidly away, running a red light in the process. They were next seen moments thereafter when they again switched cars at the spot nearby where their second car waited with another man behind the wheel and the motor running.

The license number of the car used to leave the store was obtained by witnesses who had observed appellants' flight. Although appellant Cooper later asserted that the car "belonged" to him, it was registered to a third person in another part of Los Angeles. Subsequently, each of the appellants was arrested and each gave statements after being fully advised of their constitutional rights in accordance with the rules enunciated in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

The statements of Cooper, Bosby and Rhone were tantamount to confessions that they were attempting to rob the store when the shooting occurred but each denied committing the murder itself. Each statement involved all four defendants. Harrington admitted only that he had driven to the market with three Negroes but originally had remained in the car until he decided to follow them in order to purchase cigarettes. He admitted fleeing with "Jesse and Rhone" and spending the night with them in a motel in Pasadena where he dyed his hair from red to black and shaved off his moustache.

■ Appellants' initial assignment of error, of course, was based upon the hope that California would choose to apply the additional requirements of *Miranda* v. *Arizona, supra,* 384 U.S. 436, retroactively as *People* v. *Dorado, supra,* 62 Cal.2d 338, had applied the ruling in *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758]. Unfortunately for appellants, but fortunately for society, our Supreme Court declined the option permitted by *Johnson* v. *New Jersey,* 384 U.S. 719 [16 L.Ed.2d 882, 86 S.Ct. 1772], and restricted the application of *Miranda* to cases tried after June 13, 1966. (*People* v. *Rollins,* 65 Cal.2d 681, 683 [56 Cal.Rptr. 293, 423 P.2d 221].)

■ Nevertheless, although the statements of each appellant were properly admissible in evidence against such appellant, they are correct in their contention that the trial court did not anticipate and conform to the new rules regulating

the use of extrajudicial statements subsequently promulgated in *People* v. *Aranda, supra,* 63 Cal.2d 518, 530-531. The partial retroactivity of these rules was established in *People* v. *Charles,* 66 Cal.2d 330, 335-337 [57 Cal.Rptr. 745, 425 P.2d 545]. This error, however, does not require automatic reversal. In *People* v. *Lara,* 67 Cal.2d 365, 392-393 [62 Cal.Rptr. 586, 432 P.2d 202], the Supreme Court most recently expressed itself in the following manner :

"The confession of each defendant implicated the other. On its face, this record shows a violation of the rules of practice declared in *People* v. *Aranda* (1965) *supra,* 63 Cal.2d 518, 528-531, which require the trial court to determine whether those parts of a confession implicating a codefendant can be effectively deleted without prejudice to the declarant, and if they cannot, to sever the trials or exclude the confession. It must be acknowledged that the present trial took place before *Aranda* was decided, and fully complied with the requirement of limiting instructions under the prior law. However, since the *Aranda* rules govern in all casess till pending on direct review (*People* v. *Charles* (1967) 66 Cal.2d 330 [57 Cal. Rptr. 745, 425 P.2d 545]), the admission into evidence of certain of defendants' unedited confessions constituted error. But *Aranda* makes it clear (63 Cal.2d at p. 527) that the error is reversible only if it causes prejudice. Here, as in *Charles,* each defendant's case was shattered in any event by the impact of his own detailed confession, and the fact that each was also implicated by his codefendant's confession cannot realistically have contributed to either conviction. In these circumstances, we are of the opinion that it is not reasonably probable that a result more favorable to defendants would have been reached had the *Aranda* rules been followed. (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

"We do not mean to imply that a violation of the *Aranda* rules will be automatically nonprejudicial as to any defendant who has made a confession of his own. In every such case the issue remains whether the effect of any circumstances which might otherwise have mitigated the impact of the defendant's confession was overcome by the portions of a codefendant's statement implicating the defendant; in that event, the implication would be prejudicial despite the defendant's own confession. Such a situation might occur, for example, when the confessing defendant presented evidence to show his statement was not freely given, and also denied its truth on the

witness stand. In the case before us, however, Lara made no such denial; on the contrary, he admitted he told the police the whole story of what had happened on the night of the killing.'' (See also our recent extended analysis of this aspect of *Aranda* in *People* v. *Wattie,* 253 Cal.App.2d 403, 411-414 [61 Cal.Rptr. 147].)

As we have previously indicated, the evidence against each appellant, apart from his own extrajudicial statement and those of his codefendants, was exceedingly strong. Their identity as the parties involved in the events within the market is not disputed. Their switching of cars before and after their entry upon the premises had been established. Three of the party had drawn guns and were directing the victims to the rear of the store when the fatal shot was fired. Cooper had cashed checks in the market previously and the inference is virtually inescapable that the four appellants, acting in concert, had entered the market at that particular time and on that particular day of the week with the intention of forcefully stealing the large amounts of cash which then would be present on the premises. They were engaged in the attempt so to do when the killing occurred.

None of the appellants either ''presented evidence to show his statement was not freely given, [or] denied its truth on the witness stand.'' (*People* v. *Lara, supra* 67 Cal.2d at p. 393.) Rhone, the only appellant to testify in his own behalf, expressly conceded the free and voluntary nature of his extrajudicial statement and the overall accuracy and truthfulness of its contents. That is to say, Rhone testified that he and his codefendants had discussed the robbery in advance and the part each person was to play therein. They had definitely agreed that the robbery would occur on a Friday when the greatest amount of money would be obtainable. He corroborated each of the events described by the prosecution's witnesses. Further, he confirmed the fact that a futile attempt had been made to open the cash register after the shooting.

The sole defensive thrust of Rhone's testimony was his contention that although he had agreed to commit the robbery if the conditions in the market were favorable and as described to him by Cooper and Bosby, nevertheless when the conflict between Bosby and Mr. Serna had occurred, he had not as yet reached a decision and therefore his participation did not amount to an *attempt* to rob. For example, on direct examination the following questions and answers are reported: ''Q. Then, is it your statement that although you

went into the store to pull a robbery, you didn't have one? A. Well, no, not exactly. We went into the store to look at it. You see, I hadn't even seen it yet. Q. I see. That is, you wanted to case the place? A. Right.''

Under cross-examination concerning his earlier statement to the police, Rhone further clarified the limited nature of his later version of the situation, and then, in effect, destroyed any semblance of merit it might otherwise have presented: ''Q. Then Officer Vaughn asked you, 'Did you and the previous persons I have just mentioned get together some place Friday and discuss or have a conversation pertaining to possibly robbing this market?' and you said, 'Yes, sir.' A. Yes, sir. Q. And he asked you, 'Approximately what time was that?' And you said, 'About noon'? A. Yes, sir. Q. He asked you, 'Where was that?' And you said, 'In Compton'? A. Right. Q. He asked you, 'At your sister's house?' And you said, 'Yes'? . . . A. Yes, sir. Q. And then the officer asked you, 'Whose idea was this to rob the market?' And you said, 'It was Jesse's'? A. Yes, sir. Q. He asked you, 'Did Jesse lay out the plans?' You said, 'Yeah.' 'To knock over the market?' And you said, 'Yeah'? A. Yes. Q. Then he asked you, 'Was Jesse Bosby or Gilbert Cooper to go in the market first or this white fellow known as Glen Harrington'? A. Yes sir. Q. And you said, 'To try and cash a check'? A. Yes, sir. Q. Is that right? A. Right. *Q. Was that the agreement? A. That's the way it was supposed to go, yes, sir. . . . Q. Is that the way you were going to do it that day? A. It wasn't decided whether we'd do it that day or not. . . . Q. Isn't that what happened that day? A. Thats what happened, yes, sir.''* (Italics added.)

We therefore, dispose of this aspect of the appeals of Rhone, Bosby and Cooper in the following apposite paraphrase of the holding in *People* v. *Charles, supra,* 66 Cal.2d 330, 338: ''Turning first to the basic *Aranda* violation, we consider crucial the fact that each defendant's case was completely shattered by his own detailed confession, corroborated by the eyewitness testimony of [the independent witnesses and] the robbery victim[s]. In this setting, the fact that each defendant was also implicated by his codefendant[s'] confession cannot realistically have contributed to [his own] conviction. . . . [W]e find no reasonable probability in this case that [the] jury would have returned a more favorable verdict for [appellants] if, as required by *Aranda,* the defendants had been tried separately or each confession

had been 'edited' to include no references damaging to the nondeclarant[s]."[3]

Although it is true that appellant Harrington did not make a confession, nevertheless he did admit that he was the red-haired man who had entered the store with his three Negro companions; that he had fled with them after the murder; and that thereafter he had dyed his hair black and shaved off his moustache. Inasmuch as the victims of the robbery had testified that Harrington had drawn a gun, ordered Ashcraft to "Hold it," and that they were moving to the rear of the establishment as directed when Mr. Serna was killed, it is virtually inconceivable that any jury could have escaped the conclusion that Harrington was engaged in an attempted robbery and was answerable for the murder committed by his co-conspirator in the course thereof.

■ Appellants' final contention based upon alleged error in instructing the jury is unmeritorious for two reasons. First, it was perfectly and unmistakably clear from the moment that the prosecution made its opening statement to the jury, until it closed its final argument, that the instant case was being tried upon the theory of the felony-murder doctrine. No indication was ever given at any time that the prosecution was contending that Mr. Serna's death had been specifically deliberated and premeditated in the ordinary usage of these terms. In addition, the court did not give any instruction concerning premeditation in first degree murder. (Cf. CALJIC 303.) The sole basis for appellants' argument on this issue arises from the apparently inadvertent failure of the trial court to completely strike that portion of CALJIC 302-A[4] that refers to premeditated killings. As given, the instruction was only partially deleted as follows: "All murder which is perpetrated ~~by means of poison or lying in wait, torture,~~ or by any other kind of willful, deliberate and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, ~~burglary,~~

---

[3]In this regard it is rather ironic to note that with remarkable prescience and with the careful attention he gave to appellants' rights throughout the trial, the trial court in the instant case initially actually had required the statements to be edited prior to being presented to the jury. For his pains he was accused by one defense counsl of increasing the prejudicial effect of the statements because it was then impossible for the jury to hear which party had done what and therefore they might conclude that his client had done more than he actually had. The court therefore reversed itself and permitted the statements to be introduced as given in order to be fair to appellants!

[4]CALJIC 302-A is a verbatim quote of Penal Code, section 189.

mayhem, or any act punishable under Section 288 of the Penal Code, is murder of the first degree, and all other kinds of murder are of the second degree.''

Inasmuch as the court did not instruct on premeditation but did give complete instructions on murder in the commission of certain felonies (CALJIC 302-F), murder of the second degree (CALJIC 305), and voluntary manslaughter (CALJIC 308-A, 310, 311, 311-A, 305-AA), we conclude that the jury was not confused as to the issues submitted for their determination. As presented to them by the prosecution, each defense counsel and by the court, the degree of the murder was to be determined solely upon the basis of the felony-murder doctrine.

However, in disposing of this assignment of error on this basis, we do not imply that appellants are correct in their basic contention that the evidence would be insufficient to warrant giving an instruction on premeditated murder quite apart from the felony-murder doctrine. As observed by the Supreme Court in *People* v. *Washington*, 62 Cal.2d 777, 781-782 [44 Cal.Rptr. 442, 402 P.2d 130] :

■ ''A defendant need not do the killing himself, however, to be guilty of murder. He may be vicariously responsible under the rules defining principals and criminal conspiracies. All persons aiding and abetting the commission of a robbery are guilty of first degree murder when one of them kills while acting in furtherance of the common design. [Citations.] Moreover, when the defendant intends to kill or intentionally commits acts that are likely to kill with a conscious disregard for life, he is guilty of murder even though he uses another person to accomplish his objective. [Citations.]

''Defendants who initiate gun battles may also be found guilty of murder if their victims resist and kill. Under such circumstances, 'the defendant for a base, anti-social motive, and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death' [citation], and it is unnecsesary to imply malice by invoking the felony-murder doctrine. To invoke the felony-murder doctrine to imply malice in such a case is unnecessary and overlooks the principles of criminal liability that should govern the responsibility of one person for a killing committed by another. [Citations.]''

When four men arm themselves with deadly weapons and enter a public market for the purpose of robbing it, or even ''to case it'' as appellant Rhone asserted, it seems clear that

" 'for a base, antisocial motive and with wanton disregard for human life, [they commit] an act that involves a high degree of probability that it will result in death.' " (*People* v. *Washington, supra,* 62 Cal.2d at p. 782.)

The judgments are affirmed.

Roth, P. J., and Fleming, J., concurred.

A petition for a rehearing was denied December 12, 1967, and the petitions of the appellants Bosby, Rhone and Harrington for a hearing by the Supreme Court were denied January 17, 1968.