[Crim. No. 8314. In Bank. Nov. 12, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLES WESLEY FURNISH, Defendant and Appellant.

_____

Mark F. Joseff, Arnold P. Mordkin, Max Hara, Hara & Mordkin and Don Harper Mills for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

PEEK, J.—A jury found defendant guilty of murder of the second degree, and he has appealed from the ensuing judgment.

The decedent, Star Furnish, was the 20-month old daughter of defendant and his wife Nancy. On the morning of May 10, 1962, as was his custom, defendant left the house for

work at 6:30. After serving breakfast to three older children later that morning Nancy looked briefly into Star's room on two occasions. Thinking that the child was asleep and, assuming that she might not feel well, Nancy concluded it best not to awaken her.

Shortly before 1 p.m. Nancy again went into the room and found Star with a plastic bag over her head. She ripped the bag from Star's face, and immediately telephoned a doctor and the defendant.

The doctor noticed that rigor mortis had set in, and although he formed an opinion that Star had died at least six to twelve hours earlier, he mistakenly told police officers that she had died two to six hours earlier. At about 2 p.m. defendant and Nancy were taken to the police station and questioned by officers. At 5 p.m. Nancy was arrested and booked on a charge of homicide, and defendant was released.

In the Furnish kitchen police officers found a second plastic bag of the same size and texture as the one removed by Nancy, and an officer attempted to place it over the child's head. Because of the close fit he was able to do so only when the child's body was placed in an upright position and the bag was worked sideways. Based on the foregoing experiment the officer formed the opinion that Star could not have put the bag over her own head.

A pathologist who performed an autopsy was of the opinion that Star died two to four hours after her last meal and that it consisted of hamburger meat, bun, and leafy vegetable. Star had had such a meal about 6 p.m. on May 9 according to defendant and Nancy.

After the police officers learned that Star could have died on the evening of May 9 when defendant was at home rather than the morning of May 10 when defendant was at work, they requested him to come to the police station. Defendant did so and talked with Officer Carberry from about 12:15 p.m. to 3 p.m. on May 11. According to defendant the officer denied his request to see Nancy, said that the police had information Nancy hated the child and had threatened to kill her two weeks earlier, and that the autopsy showed Star died one-half hour to two hours following her last meal. Carberry conceded that the foregoing discussion took place, but denied defendant's further claim that he said that Nancy was not entitled to the public defender and that an attorney would cost $1,700.

Defendant was next questioned for approximately four hours by Officer O'Donovan. About 15 minutes of the questioning occurred in a patio near the police station and the remainder in an interrogation room. The officer had suspected on the prior afternoon that defendant might be implicated in Star's death, and he sought to elicit any facts which defendant might have concerning the death. According to the officer, they discussed known facts concerning Star's death and hypothetical situations which would demonstrate the "good and bad evidence." In this latter connection O'Donovan testified that he informed defendant as to the value of different evidence because he did not want defendant to say something which he thought could clear his wife but which, upon closer examination, could be disproved. According to defendant, Officer O'Donovan said Nancy would spend the rest of her life in jail; that the children would become wards of the court, but that Nancy would be released if defendant could prove he killed Star. O'Donovan denied making any of such statements.

At the conclusion of the questioning the defendant admitted that he killed Star. Thereafter, between 7:15 and 7:45 p.m. he made a further statement in Captain Martin's office amounting to a confession of murder, a confession in the office of the Chief of Police between 7:45 p.m. and 8:45 p.m. which was tape recorded, and another confession between 9 p.m. and 11 p.m. which was taken down by a stenographic reporter. The latter statement was transcribed, and defendant signed the transcription. Between 11 p.m. and midnight, defendant took part in an alleged reenactment of the crime at his home, and during this period he was arrested. Between 12:30 a.m. and 1:15 a.m. on May 13, he had a conversation with his wife which, unknown to them, was tape recorded. Nancy was thereafter released by the officers.

At the trial testimony as to each of the statements made by defendant was introduced over objection. The tape recording of defendant's conversation with his wife was played to the jury, and the jury was given copies of the written statement. The other tape recording and the movies of the alleged reenactment were not offered into evidence.

Defendant testified in his own behalf as to his conversations with Officers Carberry and O'Donovan as noted, and further testified that at the time of his wife's arrest on May 10 Lieutenant Jamison told him "somebody would have to pay for this" due to public opinion; that by 7 p.m. on May

he believed that if he confessed his wife would be released; that his sole purpose in confessing was to obtain his wife's release; that before confessing he told O'Donovan he would confess so that his wife could be released from jail, and that O'Donovan said, "This is all right, let's do it."

Lieutenant Jamison testified that he was not on duty May 10 and was not at the police station at any time on that day.

In his confessions defendant stated that Star, who had been unwanted, had come between him and his wife; that his wife hated Star and did not learn to love her as he hoped she would; that the ensuing dissension had caused him to hate the child also and to begin considering means of doing away with Star; that on May 9 he had purchased hamburgers which the family ate at about 6 p.m. and that sometime between 7 p.m. and 8 p.m. when he put Star to bed, he knew that "something had to be done." Defendant said he went to the kitchen, took a plastic bag from the drawer, and after returning to Star's room pulled the bag over her head.

■ It is now established that an accused has a right to counsel at the prearraignment, accusatory stage and that a confession, where there has been a failure to observe that right, must be excluded. (*Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]; *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].) Our decision in *Dorado,* which was predicated upon the prior decisions of the United States Supreme Court in *Massiah* v. *United States,* 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246], and *Escobedo* v. *Illinois, supra,* 378 U.S. 478, does not constitute a general prohibition against the admission of incriminating statements made by an accused or suspect. The prohibition is directed against procedures which deny to a suspect or an accused due process of law. (*People* v. *Price, ante,* pp. 370, 378 [46 Cal.Rptr. 775, 406 P.2d 55].) ■ The use of a confession obtained in violation of *Escobedo* or *Dorado,* like the use of a coerced confession, generally requires reversal " 'regardless of other evidence of guilt.' " (*People* v. *Dorado, supra,* 62 Cal.2d 338, 356; *People* v. *Schader,* 62 Cal.2d 716, 728-731 [44 Cal.Rptr. 193, 401 P.2d 665]; *People* v. *Jacobson, ante,* pp. 319, 329-330 [46 Cal.Rptr. 515, 405 P.2d 555].)

In *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97], we held that normally the accusatory stage is reached when the officers have arrested the suspect and have undertaken a process of interrogation that lends itself to elic-

iting incriminating statements. We reasoned that the arrest encompasses two of the circumstances which indicate the advent of the accusatory stage, namely, that the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, and that the suspect is in custody. (*People* v. *Stewart, supra,* 62 Cal.2d 571, 577; see also *People* v. *Bilderbach,* 62 Cal.2d 757, 761 [44 Cal. Rptr. 313, 401 P.2d 921].)

Of course in some situations where an investigation has focused on a particular suspect the authorities may, for reasons of their own and without advising the suspect, choose to detain him although he had not been formally placed under arrest. In that case the danger that such tactics may result in incriminating statements is as great as if the suspect had been formally arrested. In other words, if the formality of an arrest were a strict condition precedent to the advent of the accusatory stage, the police could, by delaying the arrest where the situation did not demand one, circumvent the accused's right to counsel and nevertheless subject him to tactics designed to elicit incriminating statements.

We are satisfied that, although an arrest ordinarily signals the advent of the accusatory stage, the fact of an arrest is not essential to the maturing of that stage. Rather, in determining whether such stage has been reached, all of the circumstances must be considered, including such factors as the evidence of guilt in the possession of the police, the pressures short of arrest which the police exert to detain the suspect, and other factors which may subject the suspect to unusual pressures.

In the instant case the police, when the correct time of death was known to them, realized that the evidence pointed to either defendant, his wife, or both of them. The fact that one person may be involved in a crime and has come under police suspicion does not preclude the investigation focusing upon a second suspect. (*People* v. *Stewart, supra,* 62 Cal.2d 571, 580.) The interrogations at the police station, to which defendant submitted at police request, were not limited to a period which might be anticipated for a witness who possibly might have some information relating to a crime, but continued for seven hours until defendant admitted that he had killed Star. The questioning then continued for several more hours during which defendant repeatedly confessed before he was formally arrested. Due regard for the *Escobedo-Dorado* rule and its purpose requires us to conclude that

under the circumstances present here the accusatory stage was reached prior to the first confession and certainly prior to the several other confessions which followed and as to which testimony was introduced. The error in the admissions of such confessions is clearly prejudicial. (*People* v. *Dorado, supra,* 62 Cal.2d 338, 356-357; cf. *People* v. *Jacobson, supra, ante,* pp. 319, 329-330.)

The prosecution has the burden of showing that a suspect, once the investigation has reached the accusatory stage, was informed of his constitutional rights to counsel and to remain silent at that stage, or that he knowingly and intelligently waived those rights. Waiver cannot be presumed from a silent record. (*Carnley* v. *Cochran,* 369 U.S. 506, 516 [82 S.Ct. 884, 8 L.Ed.2d 70]; *People* v. *Lilliock,* 62 Cal.2d 618, 621-622 [43 Cal.Rptr. 699, 401 P.2d 4].) The record before us is barren of any evidence that the authorities either informed defendant of his rights or that he waived them.

In view of the improper admission in evidence of the several confessions the judgment is reversed.

Traynor, C. J., Peters, J., and Tobriner, J., concurred.

BURKE, J.—I concur in the judgment reversing the conviction of defendant under the application of section 4½, article VI, of the California Constitution. (See *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243], and *Fahy* v. *Connecticut,* 375 U.S. 85, 86-87 [84 S.Ct. 229, 11 L.Ed.2d 171].)

McComb, J., and Schauer, J.,* concurred.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.