[Crim. No. 6517.   First Dist., Div. Four.   Feb. 1, 1968.]

THE PEOPLE, Plaintiff and Appellant, v. DAN PHILLIP ELLINGSEN, Defendant and Respondent.

---

[1]*Fahy* v. *Connecticut* (1963) 375 U.S. 85 [11 L.Ed.2d 171, 84 S.Ct. 229].

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Robert R. Granucci and Derald E. Granberg, Deputy Attorneys General, for Plaintiff and Appellant.

John D. Nunes, Public Defender, and James R. Jenner, Assistant Public Defender, for Defendant and Respondent.

CHRISTIAN, J.—Defendant Dan Ellingsen, a 16-year-old boy was remanded by the juvenile court for criminal proceed-

ings on a charge that he murdered Kimie Turner. Informations against Ellingsen have twice been set aside by the superior court upon motion under Penal Code, section 995. On each occasion the court's ruling was based upon a determination that the defendant's confession was inadmissible under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], and that absent the confession there was insufficient evidence to hold the defendant to answer. The People appeal.

During the second preliminary hearing, conducted after the first information had been set aside, the prosecution endeavored to show through the testimony of four police officers that when the confession was made the investigation had not passed from the investigatory to the accusatory stage. On appeal the People contend that there was no constitutional violation in the obtaining of the confession and that the defendant in any event knowingly and intelligently waived his right to counsel and to remain silent by signing a confession after receiving a full admonition as to his rights.

When George Turner arrived home from work on July 28, 1966, he discovered his wife dead in the bedroom of their apartment. An autopsy revealed that Kimie Turner, the victim, had been stabbed 55 times. The cause of death was shock and hemorrhage.

Sergeant Nelson of the Alameda Police Department testified that he received information from a Mrs. Buskee that Bobby Ellingsen, defendant's brother, had indicated how the homicide occurred. While visiting Mrs. Ahl, defendant's grandmother, with whom defendant was residing, Mrs. Buskee thought she saw blood on a T-shirt that was being washed. She believed that the shirt belonged to Mr. Rexrode, defendant's uncle. On the morning of August 3, 1966, Sergeant Nelson went to the Ahl apartment, in the same building as decedent's apartment, and obtained the T-shirt from Mrs. Ahl. He brought Mrs. Rexrode and Bobby Ellingsen back to the police station with him. Bobby told him that either Mr. Rexrode or defendant owned the T-shirt. Sergeant Nelson, wanting defendant to establish the ownership of the T-shirt, had another officer bring defendant to the police station.

At approximately 10:30 a.m., defendant was brought in to one of the rooms in the Alameda police station used by the Juvenile Division. At approximately 11 a.m., Sergeant Preminger encountered defendant in the reception room. He asked

defendant if he had anything to say which would clear up the matter. Defendant replied that he did not. Although defendant was not asked whether he wanted to go home for lunch (a distance of two blocks), a hamburger and milkshake were ordered for him. He refused to eat.

At 1:30 p.m. Sergeant Nelson and Sergeant Preminger began questioning defendant about his background. During the first hour of interrogation, defendant was not asked if he killed Kimie Turner. However, defendant was asked if he knew who did kill Kimie Turner, and whether either Bobby or Mr. Rexrode did it. Defendant replied that he did not think Mr. Rexrode committed the homicide, but he did not know about Bobby. Defendant said that he first heard about the homicide when his grandmother phoned a poolroom in Oakland where he was shooting pool with his aunt and uncle.

Sergeant Preminger testified that during this first hour he did not suspect that defendant was the killer. His stated purpose in questioning defendant was not to elicit any incriminating statements. Both he and Sergeant Nelson had several theories on the murder; they had not ruled out Bobby, the Rexrodes, a former husband of the victim, a sex maniac, or a burglar.

At 2:30 Sergeant Mills took over the interrogation. Knowing that defendant was barely 16 years old, Sergeant Mills asked defendant if he committed the crime; defendant denied it. Several times during the afternoon defendant denied guilt. At first he denied ever being in the Turner apartment, but after a half hour of questioning defendant admitted being there two days before the homicide. On that occasion, he entered the Turner apartment for the purpose of turning off the master switch as his uncle was rewiring the back porch. While in the bedroom, he tried several bureau drawers looking for something to take. Following up this admission, Sergeant Nelson later secured permission from Mrs. Ahl to search her garage. There he discovered a purse hidden in the paneling.

After speaking with Mr. Rexrode and Bobby between 2:30 and 3:45, Sergeants Nelson and Preminger resumed their interrogation of defendant at 3:45. At this time Sergeant Preminger noticed a rust colored stain on defendant's left sneaker and also saw some stains on his trousers. Defendant explained that the stains were caused by glue. The police then took defendant's trousers and sneakers away for analysis. Traces of blood were found on the trousers, but nothing on the sneakers. A set of comparison finger prints were taken about 3:30. Some time after 4:15, Bobby was brought in to confront the defend-

ant and admonish him to tell the truth. By 4:30 p.m. Sergeant Nelson suspected that defendant was the murderer, although he still suspected Bobby and Mr. Rexrode. Sergeant Preminger, testifying at the second preliminary hearing, said that he did not suspect defendant at this point. One of the officers observed that defendant "was rather pallid at the time."

At 4:30 p.m., Sergeants Pope and Mills relieved Sergeants Preminger and Nelson. During the course of the continuing interrogation defendant appeared upset; his voice was low and he was defiant. At times he would not answer questions until they were repeated. Sergeant Mills asked defendant if the stains on his trousers were caused by blood. Defendant denied that they were blood stains. At 5 p.m., defendant was still wrapped in a blanket which the police had provided when his trousers were removed. At this time Sergeant Mills said the investigation was still open. Sergeant Pope testified that although defendant was asked a number of times to identify the killer he did not suspect defendant more than anyone else.

Some time between 6 and 6:50, Mr. and Mrs. Rexrode and Bobby were sent home. Apparently defendant was attired in normal clothing at 6:45. He refused to eat dinner. Sergeant Pope felt that defendant knew something but was not going to tell. Since the officers feared that defendant might flee the jurisdiction, they decided to detain him overnight at Juvenile Hall. When defendant was informed that his mother would be notified that he was to be taken to Juvenile Hall, defendant said he did not want his mother involved. Defendant was then asked whether he was in the room when Kimie was killed. He replied, "Yes." He was then asked whether he killed her. Again he answered, "Yes." Only after this confession was he informed of his rights. The confession was made at 6:50. At 7:10 defendant was taken to a different room and, with Sergeants Mills and Preminger present, he was given the four-point *Miranda* warning and declined the services of an attorney. A stenographer then recorded a more detailed confession. At no time did an attorney or defendant's parents assist or advise him and from 2:30 in the afternoon until he finally confessed defendant had no contact with anyone other than the relays of police officers who were questioning him.

Appellant contends that both of defendant's confessions—the one made before he received the required warnings and the one made after being informed of his rights—were obtained without violation of the rules laid down in *Miranda* v. *Arizona, supra,* 384 U.S. 436. In *Miranda* the United States Supreme

Court explored the problem of applying the privilege against self-incrimination to in-custody interrogation of suspects and attempted to give clear constitutional guidelines for law enforcement agencies and courts to follow. To prevent compulsion from being exerted by officers during in-custody interrogation the court held:

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By *custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.* As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. *Prior to any questioning,* the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." (384 U.S. at pp. 444-445 [16 L.Ed.2d at pp. 706-707] ; italics added.)

██ Such a warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere. If a person in custody is to be subjected to interrogation, he must be warned at the outset, when he is first subjected to police interrogation, that he has the right to remain silent. (384 U.S. at pp. 467-468, 477 [16 L.Ed.2d at pp. 719-720, 725].) Nowhere in the opinion does the court distinguish the accusatory phase of an *in-custody* interrogation from the investigatory phase.

Appellant contends, citing *People* v. *Arnold* (1967) 66

542

Cal.2d 438, 444 [58 Cal.Rptr. 115, 426 P.2d 515], that consideration must be given to three issues: (1) whether the investigation was still a general inquiry into an unsolved crime or whether it had begun to focus on a particular suspect, (2) whether defendant was in custody or otherwise significantly deprived of his freedom, and (3) whether defendant's confession was the product of a process of interrogations that lent itself to eliciting incriminating statements. Indeed, these factors are generally considered in determining the admissibility of a confession. But in *Miranda* the court declared that "At the outset, if a person *in custody* is to be subjected to interrogation, he must first be informed . . . that he has the right to remain silent." (384 U.S. 436, 467-468 [16 L.Ed.2d 694, 719-720]; italics added.)

California courts have held that a person who voluntarily comes to the police station may be regarded as being in custody. ▮ Thus for a person to be in custody it is not necessary that he be under arrest. (*People* v. *Furnish* (1965) 63 Cal.2d 511, 516 [47 Cal.Rptr. 387, 407 P.2d 299]; see also *People* v. *Arnold, supra,* 66 Cal.2d 438, 445-448; *People* v. *Kelley* (1967) 66 Cal.2d 232, 245-246 [57 Cal.Rptr. 363, 424 P.2d 947].) In *Arnold* the court held that "custody occurs if the suspect is physically deprived of his freedom of action in any significant way or is led to believe, as a reasonable person, that he is so deprived." (*Ibid.* at p. 448.) Here defendant was detained at the Alameda police station for eight hours. Both lunch and supper were brought to him, although he could have walked the two blocks to his home and returned. For a period of over an hour, he had no trousers and only one sneaker. He was questioned continually for five hours. The officers decided to detain him overnight at the Juvenile Hall to prevent his flight. At no time did the police tell this 16-year-old youth that he was free to leave. (See *People* v. *Kelley, supra,* 66 Cal.2d 232, 246.) Defendant might reasonably have believed that his freedom of action was limited.

▮ To hold an in-custody confession inadmissible under *Miranda*, it must appear that the suspect was subjected to interrogation. In *People* v. *Stewart* (1965) 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97] (affd *sub nom.* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) the California Supreme Court considered such factors as the length of the questioning, the place and time of the interview, the nature of the questions, the conduct of the police and all other relevant circumstances in determining whether interrogation had

taken place. These factors were analyzed to determine whether the police were carrying out a process of questioning tending to elicit incriminating statements. (See also *People* v. *Stockman* (1965) 63 Cal.2d 494 [47 Cal.Rptr. 365, 407 P.2d 277]; *People* v. *Davis* (1967) 66 Cal.2d 175 [57 Cal.Rptr. 130, 424 P.2d 682].)

■ Defendant was questioned in the Alameda police station. California cases have consistently held that where the questioning takes place at the police station, it is an indication that the suspect is being interrogated and must be warned. (See *People* v. *Furnish, supra,* 63 Cal.2d 511; *People* v. *Grubb* (1965) 63 Cal.2d 614 [47 Cal.Rptr. 772, 408 P.2d 100]; *People* v. *Kelley, supra,* 66 Cal.2d 232.) ■ The nature of the questions and the conduct of the police may also show whether they were interrogating defendant or merely conducting a general investigation of the crime. On numerous occasions this defendant was asked whether he ''did it.'' The officers testified that they invited defendant to the police station to identify the owner of the T-shirt. Yet defendant was grilled for five hours by relays of experienced police officers. The officers sent defendant's brother in to admonish him to tell the truth. They took his fingerprints and had him remove his trousers and sneaker when they suspected that the stains on them were blood. Though they allowed Mr. and Mrs. Rexrode and Bobby to return home, dinner was supplied to defendant. Just prior to the confession Sergeant Pope commented that defendant knew more than he was telling. The conduct of the police and the form of their questions establish that defendant was subjected to a thorough process of interrogation. The superior court correctly concluded that the confession was inadmissible under *Miranda* v. *Arizona, supra,* 384 U.S. 436.

After defendant confessed at 6:50 p.m., Sergeants Mills and Preminger called in a shorthand reporter who recorded the following:

''Q. Before I proceed I want to advise you of your rights. No. 1. I want to advise you that you have the right to remain silent, anything you say may be used against you in court, is that correct? A. Yes.

''Q. Is that correct? A. Yes.

''Q. No. 2. You have a right to consult with a lawyer and have your lawyer with you during any questioning, do you understand that? A. Yes. I don't want a lawyer.

''Q. No. 3. If you cannot afford a lawyer, you may have one

544

appointed for you by the court, do you understand that? A. Yes. I don't want a lawyer.

"Q. Having understood these three things, would you like to make a statement? A. I did it, yes.

"Q. Danny, going back to what you said, I quote, 'I did it.' What did you do? A. Stabbed Mrs. Turner."

Appellant contends that the defendant knowingly and intelligently waived his right to remain silent and right to counsel.

■ "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 475 [16 L.Ed.2d 694, 724]; see also *People* v. *Kelley, supra,* 66 Cal.2d at p. 247.) In reaffirming the high standard of proof required to prove a waiver of constitutional rights, the court stated that where the confession results from lengthy, incommunicado interrogation that in itself is strong evidence there was no valid waiver of rights. (384 U.S. 475-476 [16 L.Ed.2d at pp. 724-725].) ■ In ascertaining whether there has been a knowing and intelligent waiver, the court should examine the facts and circumstances of each case including the age, background, conduct and experience of the accused as well as his lack of prior experience with the police, his physical and mental state at the time of interrogation and his level of intelligence. (*People* v. *Hildabrandt* (1966) 244 Cal.App.2d 423, 430 [53 Cal.Rptr. 991].)

Appellant relies on *People* v. *Gomez* (1967) 252 Cal.App.2d 844 [60 Cal.Rptr. 881], where the court recognized that the age of a defendant might have bearing on his understanding of his constitutional rights, but the court held that a minor does not have the right, *ipso facto,* to disaffirm a waiver merely by asserting his non-age at trial. (See also *People* v. *Lara* (1967 67 Cal.2d 365 [62 Cal.Rptr. 586, 432 P.2d 202].)

■ Here defendant was 16 years old. The record indicates that he had a record of some kind of delinquency, but it is not clear what his experience with the law had been. During the course of the interrogation, defendant's demeanor was sullen and he refused to answer many questions. He was so upset emotionally as to refuse two successive meals. Only after he confessed was an attempt made to comply with *Miranda.* ■ Before then there could be no argument that defend-

ant waived his constitutional rights because the record is silent. (*People* v. *Lilliock* (1965) 62 Cal.2d 618, 621-622 [43 Cal. Rptr. 699, 401 P.2d 4] ; *People* v. *Davis, supra,* 66 Cal.2d 175, 180.) ██ At no time was the full meaning of the admonition explained to defendant. It would be fanciful to suggest that after the first full confession had been made defendant understood from the admonition which he received that he could even then have prevented the use of the confession against him by saying no more. Under the circumstances we have reviewed, the admonition appears to have been an empty ritual, inadequate to carry the prosecution's burden of showing that this boy knowingly and intelligently waived his constitutional right to remain silent.

██ We conclude that the confesson is not admissible against defendant at trial. It is not contended that without the confession there was probable cause to believe defendant guilty. Thus the superior court was correct in setting aside the information pursuant to section 995 of the Penal Code. (*Priestly* v. *Superior Court* (1958) 50 Cal.2d 812, 815 [330 P. 2d 39].)

The order is affirmed.

Devine, P. J., and Rattigan, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 28, 1968. Mosk, J., was of the opinion that the petition should be granted.