[Civ. No. 11754.   Third Dist.   Aug. 8, 1968.]

In re TOM LEE TETERS, a Person Coming Under the Juvenile Court Law.

JAMES D. MERCER, as Chief Probation Officer, etc., Plaintiff and Respondent, v. TOM LEE TETERS, Defendant and Appellant.

Richard M. Grossberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Harold F. Bradford, Edward A. Hinz, Jr., and Elliott D. McCarty, Deputy Attorneys General, for Plaintiff and Respondent.

REGAN, J.—Appellant, a juvenile of the age of 14 years, represented by the public defender, was adjudged to be a ward of the juvenile court of El Dorado County. He appeals from the judgment of the court.

At the hearing it was stipulated by counsel that one Augustine Potor was the owner of a 1956 Oldsmobile that had been parked by Potor in front of the Camino Hotel in Camino, and was removed without his permission either in the late evening hours of April 30, 1967, or the early morning hours of May 1.

The testimony established the appellant and his companion, Joseph Greco, had been reported as missing from Diamond Springs. The two boys had run away and made the 13-mile trip from Diamond Springs to Camino by hitching rides and walking. Upon their arrival in Camino, they went into the Antlers Club and tried to borrow some dimes so they could call home. Apparently being unsuccessful, the two boys then went to the front of the Camino Hotel where they located an automobile with an unlocked door. Greco opened the door, climbed in and started the car by ''hot-wiring'' the ignition. After getting the car started, they took turns driving until it ran out of gas about two miles away. Greco then opened the glove box in the vehicle with a screwdriver that was in the car and took out a pistol. The two boys then removed the remaining items of personal property from the car and left the scene.

Sergeant Wilson, of the sheriff's office in El Dorado County, testified that while on patrol on May 1, 1967, at about 2 a.m., he came upon the above-described Oldsmobile parked ''crossways'' on Mace Road in El Dorado County with its headlights on. Upon checking the inside of the car, Wilson noticed that the glove box was open and that the ignition switch was missing from its place in the car.

From the vehicle registration, Officer Wilson learned that the car was owned by Potor who was contacted and advised

that his car had been located on Mace Road. Wilson drove Potor to where the car had been located. Potor told the officer that the ignition switch had been in its proper place and the glove compartment locked when he parked his car in front of the hotel. Potor also told the officer that certain items of personal property were missing from his car.

Officer Wilson then put out a broadcast to various law enforcement units advising them to be on the lookout for anyone walking along the road carrying a package or other items of property. Wilson then resumed his regular patrol. A short while later, the sheriff's office received a call from Potor to the effect that he had observed two boys back of the Antlers Club in Camino and asked that they be checked out. The two boys had told Potor that they were lost and wanted to get back to the freeway. Potor gave them directions and watched them go down Carson Road and turn south on Snow Road toward Pleasant Valley.

Officer Wilson proceeded toward Pleasant Valley and found the two boys walking on Snow Road. While walking down the road, appellant attempted to hide upon seeing a car coming. After the boys were stopped for questioning by Wilson, and while he was talking to them, another officer arrived and advised that there was a missing person's report out on the two boys. Wilson then transported the boys to the sheriff's office to be held pending the arrival of their parents.

Upon arrival at the office, the officer separated the two boys. Officers Wilson and Smith then talked to appellant.

Officer Wilson, the only witness for the respondent, testified to the substance of what was said at the time by Officer Smith and appellant. Smith asked him about the car in Camino, and appellant replied that he knew nothing about the car. Appellant was then asked if he could drive, and he replied in the negative. When Officer Smith stated that he knew he could on the basis of the information in the missing person's report, appellant said he could drive. Appellant was again asked about the car in Camino, and this time appellant stated that he and Greco had taken the car in Camino.

Officer Smith then advised appellant of his constitutional rights as prescribed in *Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], which were read from a card. When asked, appellant replied that he understood these rights and was willing to waive them. Appellant also stated he did not want an attorney when asked whether he wished one. Officer Smith also asked: ''Having

these rights in mind, do you wish to talk to us now?" Appellant responded affirmatively. Appellant then made a complete confession with regard to taking the car.

Appellant took the stand in his own behalf. He stated that Greco was the instigator in taking the car and he went along reluctantly. He also claimed that Greco was the one who actually "hot-wired" the car, and that he never drove the car at any time. The boys abandoned the car when it ran out of gas.

Appellant stated that he changed his story about taking the car when the officers told him that Greco had already admitted the theft. He denied having been advised of his rights.

Appellant contends that since neither he nor his parents were advised of the right to counsel or right to remain silent prior to the interrogation, the statements obtained are inadmissible. Appellant initially relies upon *In re Gault,* 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428], and *Gallegos* v. *Colorado,* 370 U.S. 49 [8 L.Ed.2d 325, 82 S.Ct. 1209, 87 A.L.R.2d 614]. *Gault* we will discuss in detail, *infra. Gallegos* is not in point since there is no element of coercion in the instant case.

Appellant next contends that the principles set forth in *Miranda* v. *Arizona, supra,* 384 U.S. 436 [16 L.Ed.2d 694], were violated, thus making the statements of appellant inadmissible. The Attorney General agrees that the requirements of *Miranda* are applicable to minors and juvenile court proceedings, but not because of *Gault.* In his brief the Attorney General states:

"It is the requirement of Welfare and Institutions Code, § 701 that 'a preponderance of evidence, legally admissible in the trial of criminal cases, must be adduced to support a finding that the minor is a person described by Section 602' that brings *Miranda* into play."

The Attorney General then contends that the appellant's statement ("they had taken the car in Camino") was properly admitted as a response to a general inquiry ("What happened to the car in Camino?") by an officer commencing an investigation of an unsolved crime.

Appellant, however, contends his out-of-court statements were inadmissible in the juvenile court proceeding because of the failure to advise him of his constitutional rights prior to the time he made the statements.

█ We hold that appellant, at the time he was questioned and gave his answers, was a suspect and the questioning was custodial interrogation. The juveniles were in custody as

"run-aways" and the officers were seeking information prior to the arrival of the parents. It is true that conduct of the officers during the 15-minute inquiry was neither oppressive nor coercive. However, the questioning was conducted under the conditions which invite coerced confessions and other evils of custodial interrogation and falls within the scope of the *Miranda* warning rule.

In *People* v. *Fioritto,* 68 Cal.2d 714, 717-718 [68 Cal. Rptr. 817, 441 P.2d 625], filed June 20, 1968, the court stated: "On this appeal the sole issue is the admissibility of defendant's confession. The People insist that the confession was admissible because the record contains no suggestion of impermissible interrogation techniques on the part of the detective who conducted the interview. But the People misconceive the *ratio decidendi* of *Miranda.* A principal objective of that decision was to establish safeguards that would liberate courts insofar as possible from the difficult and troublesome necessity of adjudicating in each case whether coercive influences, psychological or physical, had been employed to secure admissions or confessions. We need not review here the history that produced the *Miranda* decision since it has been analyzed in innumerable cases and commentaries. It is sufficient to reiterate the words of Chief Justice Warren: 'The current practice of incommunicado interrogation is at odds with one of our Nation's most cherished principles—that the individual may not be compelled to incriminate himself. Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice.' (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 458 [16 L.Ed.2d 694, 714, 86 S.Ct. 1602, 1619, 10 A.L.R.3d 974].)

"It becomes our constitutional responsibility, therefore, to determine in every criminal case that the full panoply of *Miranda* 'protective devices' is satisfied. . . .

"We must first ascertain whether in this case police authorities were under an obligation to give the *Miranda* warnings. As that opinion makes plain, the procedural safeguards therein come into play only where 'custodial interrogation' is involved, and by 'custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 444 [16 L.Ed.2d 694, 706, 86 S.Ct. 1602, 1612, 10 A.L.R.3d 974].) While the defendant here had not been for-

mally arrested, we have long held that a suspect must be fully apprised of his rights upon being ushered into a police station and detained for questioning. (See, e.g., *People* v. *Furnish* (1965) 63 Cal.2d 511, 516 [47 Cal.Rptr. 387, 407 P.2d 299]; *People* v. *Chaney* (1965) 63 Cal.2d 767, 769 [48 Cal.Rptr. 188, 408 P.2d 964].)''

It is true Officer Wilson testified that the officers had no suspicion that appellant was involved in an auto theft. However, the record also contains the following statement elicited at the hearing:

''A [By Officer Wilson] We got down to the sheriff's office and separated the two boys and asked them what time they were at different places. They were in Camino approximately 12:30 a.m., and before we called the parents, Officer Smith, who had taken the missing person's report on the two boys from Diamond Springs, came in and we talked about the matter of the car being taken, talked it over, and we then went in and talked to the Teters boy. Officer Smith asked the Teters boy something on the line of 'What about the car?', 'What happened to the car in Camino?' ''

From the record we conclude the two boys were suspects, and the only suspects, at the time the incriminating statements were made. The *Miranda* warning had not been given at the time, and thus the confession was invalid and should have been excluded.

Respondent next contends:

''Assuming *arguendo* that appellant Teters' extrajudicial confession was inadmissible, the question on appeal is 'whether there is substantial evidence to support the juvenile court judge's determination that a preponderance of the evidence existed exclusive of the confession of appellant.' *In re Acuna, supra* [(1966) 245 Cal.App.2d 388 (53 Cal.Rptr. 884)], p. 393.''

In a series of appellate cases beginning with *In re Castro* (1966) 243 Cal.App.2d 402 [52 Cal.Rptr. 469], it was held that invalid confessions though admissible in juvenile court, cannot be relied upon to support a finding that the minor committed a crime. In *Castro*, at page 411, the court states:

''Thus, by the well-considered and specific provisions of the code section [§ 701, Welf. & Inst. Code] regulating the receipt of evidence at the hearing, the trial court is directed to permit all evidence which bears on the question whether the minor is a person described in section 602 of the Welfare and Institutions Code, but at the same time the court is specifically pre-

vented from making a finding of wardship in a case of this kind unless there is a preponderance of evidence to that effect, which would have been legally admissible on the trial of a criminal case of this kind. All evidence bearing on the questions at issue is admissible by the express provisions of the sections, but the utilization of the evidence by the court is strictly controlled. In determining whether Castro should be named as a ward of the court, it is essential that the judge completely disregard all of the evidence relative to confessions to the police officers, because such confessions would not have been legally admissible on the trial of the case if a criminal charge against Castro had been brought in the adult court. There remains, therefore, the question whether entirely apart from this excluded evidence there was a preponderance of evidence legally admissible on the trial of an adult criminal in a case of this kind, which showed the commission of crime by Castro.'' (Accord, *In re Buros* (1967) 249 Cal.App.2d 55, 57 [57 Cal.Rptr. 124] ; *In re Acuna, supra,* 245 Cal.App.2d at p. 393 [wherein this court states: ''The question before us as an appellate court is whether there is substantial evidence to support the juvenile court judge's determination that a preponderance of the evidence existed exclusive of the confession of appellant.''].)

The evidence in the case before us which would warrant a finding that appellant unlawfully took and drove a vehicle not his own, without the consent of the owner and with the intent of depriving the owner of possession (Veh. Code, § 10851), was the result of appellant's in-court confession as well as the extrajudicial confessions. There was no evidence introduced exclusive of appellant's confessions. We hold his extrajudicial confessions impelled his testimonial one.

Subsequent to the holdings in *Castro* and *Acuna,* the U.S. Supreme Court, on May 15, 1967, decided *In re Gault, supra,* 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428], in which it was held that a 15-year-old boy committed as a juvenile delinquent was denied due process of law because juvenile delinquency proceedings which may lead to commitment in a state institution must measure up to the essentials of due process and fair treatment, including application of the constitutional privilege against self-incrimination.

In *Gault, supra,* the court states, at pages 30-31 [18 L.Ed. 2d at pp. 547-548] : ''In *Kent* v. *United States, supra,* [383 U.S. 541 (16 L.Ed.2d 84, 86 S.Ct. 1045)] we stated that the Juvenile Court Judge's exercise of the power of the state as

parens patriae was not unlimited. We said that 'the admonition to function in a "parental" relationship is not an invitation to procedural arbitrariness.' With respect to the waiver by the Juvenile Court to the adult court of jurisdiction over an offense committed by a youth, we said that 'there is no place in our system of law for reaching a result of such tremendous consequences without ceremony—without hearing, without effective assistance of counsel, without a statement of reasons.' We announced with respect to such waiver proceedings that while 'We do not mean . . . to indicate that the hearing to be held must conform with all of the requirements of a criminal trial or even of the usual administrative hearing; but we do hold that the hearing must measure up to the essentials of due process of fair treatment.' We reiterate this view, here in connection with a juvenile court adjudication of 'delinquency,' as a requirement which is part of the Due Process Clause of the Fourteenth Amendment of our Constitution.'' And, at page 44 [18 L.Ed.2d at p. 555]:

''In reviewing this conclusion of Arizona's Supreme Court, we emphasize again that we are here concerned only with proceedings to determine whether a minor is a 'delinquent' and which may result in commitment to a state institution. Specifically, the question is whether, in such a proceeding, an admission by the juvenile may be used against him in the absence of clear and unequivocal evidence that the admission was made with knowledge that he was not obliged to speak and would not be penalized for remaining silent. In light of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] we must also consider whether, if the privilege against self-incrimination is available, it can effectively be waived unless counsel is present or the right to counsel has been waived.'' And, at pages 47-48 [18 L.Ed.2d at pp. 557-558]:

''It would indeed be surprising if the privilege against self-incrimination were available to hardened criminals but not to children. The language of the Fifth Amendment, applicable to the States by operation of the Fourteenth Amendment, is unequivocal and without exception. And the scope of the privilege is comprehensive. As Mr. Justice White, concurring, stated in *Murphy* v. *Waterfront Commission* (1964) 378 U.S. 52, 94 [12 L.Ed.2d 678, at p. 704, 84 S.Ct. 1594]:

'' 'The privilege can be claimed in *any proceeding,* be it criminal or civil, administrative or judicial, investigatory or adjudicatory . . . it protects *any disclosures* which the wit-

ness may reasonably apprehend *could be used in a criminal prosecution or which could lead to other evidence that might be so used.'* (Italics added.)'' And, at pages 49-50 [18 L.Ed. 2d at pp. 558-559]:

''It would be entirely unrealistic to carve out of the Fifth Amendment all statements by juveniles on the ground that these cannot lead to 'criminal' involvement. In the first place, juvenile proceedings to determine 'delinquency,' which may lead to commitment to a state institution, must be regarded as 'criminal' for purposes of the privilege against self-incrimination. To hold otherwise would be to disregard substance because of the feeble enticement of the 'civil' label-of-convenience which has been attached to juvenile proceedings. Indeed, in over half of the States, there is not even assurance that the juvenile will be kept in separate institutions, apart from adult 'criminals.' In those States juveniles may be placed in or transferred to adult penal institutions after having been found 'delinquent' by a juvenile court. For this purpose, at least, commitment is a deprivation of liberty. It is incarceration against one's will, whether it is called 'criminal' or 'civil.' And our Constitution guarantees that no person shall be 'compelled' to be a witness against himself when he is threatened with deprivation of his liberty—a command which this Court has broadly applied and generously implemented in accordance with the teaching of the history of the privilege and its great office of mankind's battle for freedom.'' And, at page 55 [18 L.Ed.2d at p. 561]:

''We conclude that the constitutional privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults. We appreciate that special problems may arise with respect to waiver of the privilege by or on behalf of children, and that there may well be some differences in technique—but not in principle—depending upon the age of the child and the presence and competence of parents. The participation of counsel will, of course, assist the police, Juvenile Courts and appellate tribunals in administering the privilege. If counsel is not present for some permissible reason when an admission is obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it has not been coerced or suggested, but also that it is not the product of ignorance of rights or of adolescent fantasy, fright or despair.'' And, at page 57 [18 L.Ed.2d at p. 562]:

''As we said in *Kent* v. *United States* (1966) 383 U.S. 541,

554 [16 L.Ed.2d 84, 93, 86 S.Ct. 958], with respect to waiver proceedings, 'there is no place in our system of law for reaching a result of such tremendous consequences without ceremony. . . .' We now hold that, absent a valid confession, a determination of delinquency and an order of commitment to a state institution cannot be sustained in the absence of sworn testimony subjected to the opportunity for cross-examination in accordance with our law and constitutional requirements.''

In *People* v. *Spencer* (1967) 66 Cal.2d 158 [57 Cal.Rptr. 163, 424 P.2d 715], the court considered whether the defendant's extrajudicial confession, erroneously admitted into evidence, caused prejudice to the defendant who also made a judicial confession. The court stated (at p. 163) : ''We have held that use of a confession violative of *Escobedo* and *Dorado* necessarily compels reversal of the resulting conviction since a confession so completely shatters a defendant's case that its erroneous use at his trial works incalculable damage and precludes a finding of harmless error notwithstanding overwhelming extrinsic evidence of guilt. [Citations.]

''The State contends that, since the jury in this case heard the defendant admit his guilt on the witness stand, the use of defendant's unlawfully obtained confession should be deemed harmless error on the theory that defendant's extrajudicial statement probably played little if any role in the jury's deliberation. [Citations.] Even if we assume that the United States Constitution would permit the application of a harmless error rule under such circumstances, we could not rest affirmance of the judgment solely upon our evaluation of the minor effect of defendant's confession upon the *jury*; we must still weigh its impact upon defendant's *trial*.'' And, at pages 167-169 : ''Here, as in *Fahy,* the precise issue which we are therefore called upon to resolve is 'whether there is a *reasonable possibility* that the evidence complained of' (italics added) (375 U.S. at p. 86 [11 L.Ed.2d at p. 172])—in this case, the extrajudicial statement—'*might* have contributed to the conviction' (italics added) (*id.*, at pp. 86-87 [11 L.Ed.2d at pp. 172-173])—in this case, by inducing the defendant's judicial confession of guilt.

''Under the circumstances of the instant case, we cannot realistically ignore the possibility that defendant's extrajudicial confession *might* have impelled his subsequent confession in court. We recognize that no court has ever 'gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from mak-

ing a usable one after those conditions have been removed.' (*United States* v. *Bayer* (1947) 331 U.S. 532, 540-541 [91 L.Ed. 1654, 1660-1661, 67 S.Ct. 1394].) Nonetheless, the courts have not been blind to the fact that 'after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good.' (*Id.*, at p. 540 [91 L.Ed. at p. 1660].) In this sense, a later confession may always be viewed in part as fruit of the first. [Citation.] We must therefore recognize that it is always *possible* that an improperly obtained confession will induce the defendant to render a later admission of guilt. 'Admittedly, it is difficult to determine whether there is a connection between the two confessions. But, human nature being what it is, we must recognize a presumption that one is the fruit of the other.' (*Killough* v. *United States* (1962) 114 App.D.C. 305 [315 F.2d 241, 249] (Wright, J. concurring); see also *People* v. *Jones, supra,* 24 Cal.2d 601, 609-610 [150 P.2d 801].)

"To overcome the likelihood that the erroneous introduction of defendant's extrajudicial confession impelled his testimonial one, the State bears the burden of showing that the causative link between the two confessions had been broken. '[T]he beneficiary of a constitutional error [must] prove *beyond a reasonable doubt* that the error complained of did not contribute to the verdict obtained.' (Italics added.) (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824].) The prosecution has failed to do so here. Instead, the prosecution urges us to speculate upon the defendant's motives for testifying and to infer, from a record which leaves the issue completely unexplored, that his decision to confess in court did not emanate from the erroneous receipt in evidence of his extrajudicial statement of guilt. We cannot posit so important a determination upon so conjectural a base.

"Although substantial evidence other than defendant's extrajudicial confession connected him with the crime, his case had been shattered by the 'evidentiary bombshell' of that confession. [Citations.] In light of the overwhelming damage thereby inflicted by the prosecution, we must surely acknowledge at least a 'reasonable possibility' that the defendant took the stand in part because a confession which he erroneously believed admissible had completely demolished his pros-

pects for a favorable verdict. In recognizing such a possibility here, we do no more than heed the admonition of Justice Cardozo: 'The springs of conduct are subtle and varied. One who meddles with them must not insist upon too nice a measure of proof that the spring which he released was effective to the exclusion of all others.' (*DeCicco* v. *Schweizer* (1917) 221 N.Y. 431, 438 [117 N.E. 807].) ''

As noted in *Gault, supra,* the constitutional privilege against self-incrimination is as applicable to juveniles as it is to adults. We, therefore, conclude, as the court did in *Spencer, supra,* 66 Cal.2d at p. 169, ''that the record in this case fails to dispel beyond a reasonable doubt the possibility that the defendant took the stand in an attempt to mitigate the explosive impact of a confession which had left his case in ruin.'' Counsel for defendant vigorously opposed the introduction of the confession at the wardship hearing, and it is reasonable to assume appellant took the witness stand in an attempt to mitigate the damage resulting from its erroneous introduction. Thus, the *Castro* line of cases is completely distinguishable since absent the invalid confession there was *no* evidence which was legally admissible.

The order of wardship is reversed.

Pierce, P. J., and Friedman, J., concurred.

A petition for a rehearing was denied September 5, 1968, and respondent's petition for a hearing by the Supreme Court was denied October 3, 1968. McComb, J., and Mosk, J., were of the opinion that the petition should be granted.